Ami Dunn v. Global Trust Management, LLC So the claim cannot be adjudicated, not fairly, at least. What do you say about it? Here's, I guess, my issue about the delegation clause. I read the district court's order on sort of the overall enforceability of the arbitration agreement, and I'm looking in there for something that an arbitrator him or herself couldn't say, right? And so I don't, I'm trying to figure out, I guess, kind of answer this for me. I mean, is there anything in the district court's order that you couldn't get from an arbitrator, right, that the arbitrator could say the same thing the district court did and then you'd win in front of the arbitrator on delegation? Yes, because there's a step that is necessary in evaluating enforceability that the arbitration clause itself prohibits because it bans state law. And the step is deciding whether the choice of law selected by the parties is valid in the first place. Sure, parties can choose law and the choice is presumptively enforcement, but it's not absolute. State law provides defenses to the enforcement of a clause. In your example, if the party selected the law of Mars or the law of personal combat, in any state, and even under the, in a federal question case here, under the application of the restatement, an entity can say, well, we did sign that agreement, but it's not enforceable because it violates policy, public policy of the state that would otherwise be, whose law would otherwise apply. And that's the analysis that the court went through that an arbitrator couldn't go through. And I just, I mean, maybe I'm dense, but I don't understand why that is. Why can't the arbitrator go through that analysis that the court could go through? Because the savings clause ensures that an arbitrator have access to laws, to grounds as exist in law and equity that would apply to any other contract. That's a key component to the FAA structure. So this clause removes that. Because this court, the Supreme Court, in the first option cases and the cases that came after that, and this court in the Basemore case and others, made clear that the savings clause requires application of state law. And it is articulated by the Supreme Court as a substantive mandate for the application of state law principles. And this makes sense. A state like Florida has a legitimate interest in regulating commerce in its borders and protecting its consumers. We know that. The way its interest is manifested in an arbitration clause or any other state is the savings clause. You can't, the savings clause prohibits an arbitration clause to shut out state court interest or state interest. If you... But counsel, don't we do that all the time in the state of Florida? Let's say with respect to cruise ship and state court where we would get an appeal saying, they're saying that we can't litigate our state claims in state court, that we can only litigate in federal court. Well, I think you have to distinguish between the procedural or the formation issues, the delegation issues. Is it enforceable? And then what kinds of claims are articulated? And in those, the cruise ship cases, there are a lot of ability cases where you have clauses that incorporate the laws of Germany or whatever. But the decisions are weighing the home regime, legal regime, versus another regime that exists. And a lot of those cases talk about, well, there's applicable principles of law over here, so it's not completely shut out. Here, it shuts out everything, and it directly, an absolute ban on state law, directly clashes with the plain language of the FAA, grounds as exist, not grounds... What if your client had opted out of the arbitration agreement because the form allows for a written opt-out, does it not? Well, and this is probably one of the worst aspects of the clause because the opt-out, the whole idea of an opt-out is supposed to allow a plaintiff or litigant to opt out of an arbitration regime because it's unfair and into something that provides more protection or at least equal protection. This opt-out does nothing. First of all, it does nothing to the ban on state law, which is unique here. And it just shifts the venue to the tribal court. And as I read the opt-out, it even eliminates the applicable federal law component because at least some of the versions of this complaint say that if you do opt out and you end up in the tribal court, then you only are subject to tribal laws. But even if you take applicable law, and you apply it to this opt-out, you don't change the fundamental unfairness and the fundamental unworkability of the clause because you don't add the grounds as exist in law and equity that would apply to any other contract as required by the savings clause. So it doesn't save anything. It, in fact, puts her out of the pot and into the frying pan because it still prevents her from bringing her state and federal claims, and even more so because she doesn't even have applicable federal law, and it changes the venue, the form only. And we add in our brief that the opt-out places the plaintiff before a court that doesn't have subject matter jurisdiction. And this is discussed in some of the tribal cases with, I believe, Jackson and some of the others in the other circuits, that tribal court jurisdiction is focused on transactions that concern the reservation and members. And it's highly questionable that the tribal court would have any subject matter jurisdiction in an opt-out situation, and you can, of course, cannot waive or create subject matter jurisdiction by agreement. The, just to address briefly, the federal, I'm sorry, the state law under Romero, and Romero is a lower court decision or a DCA decision, but it was, its principle was adopted by the Florida Supreme Court in the Schatz case that strictly prohibits any contract provision that bans the adjudication of remedial rights. The reason that that's important, because it not only represents the state perspective waiver doctrine, but it also, we have this debate below and in the briefings about whether the strong policy test applies under federal law. I'm sorry, state law with respect to the enforceability of the conflict of law or the choice of law clause, or this fundamental policy test that the court applied because it sat in federal question jurisdiction and applied the restatement. But it doesn't matter, because you get to the same result either way. Both doctrines, restatement and the strong policy doctrine, both allow a choice of law clause to be circumvented when it violates important state policy, whether you call it fundamental or strong. And there is no doubt that the Romero rule is a strong policy articulated by the courts of Florida that say no matter what, you cannot agree to extinguish remedial consumer rights. If the legislator takes the time and effort to articulate remedial consumer protections, you can't contract those away. I see I'm out of time. Thank you. If there's no other questions, I'll pass. Thank you. Thank you, counsel, very much for your argument. Mr. Berlo, you have five minutes remaining for rebuttal. Thank you, Your Honor. I want to begin, Judge Brasher, with the question that you presented, which is, is there anything in the district court's decision that an arbitrator could not say? The answer my colleague here gave today was yes, and he says that's because there's an out-and-out ban under these agreements on the application of all-state law. That's wrong, and it's wrong for really two reasons. The first is that there is not an out-and-out ban on all-state law. We've talked about it in our brief that the tribal law that applies here has incorporated Louisiana state contract law into the tribal law, and that gives you at least an avenue to make your contractual argument. The second point along those lines is that the question is not whether or not it incorporates state or federal law, state law. The question is whether it allows for the recognition of defenses, challenges to the enforceability or validity of the contract. One of the things... The problem here is you need to look a little bit at what the plaintiffs are doing. They are trying to take the most unfavorable reading they possibly can to their own interests from this agreement, and then saying, well, there's no way that we can mount an effective enforceability or validity challenge. That gets it 100% backwards, and the plaintiff basically acknowledged as much. Again, there is a special rule of construction. All doubts are resolved in favor of arbitration, not against. This idea that what the plaintiffs ought to do is try and find a way to blow up the entire agreement by essentially saying that every single thing in it is likely to be or must definitely be resolved against their interest by an arbitrator simply gets its wrong. I'd point out, in the plaintiff's brief, you'd think there had never been a decision from the Supreme Court regarding delegation clauses. It cites Jackson, the rent-a-center against Jackson, only once, only in a general quote about what delegation clauses are, and it ignores entirely the Henry Schein decision. I would commend those cases to your honors. I think if you look at those, it makes the practice and policy from the Supreme Court about how the Arbitration Act is supposed to apply perfectly clear. And if I can just take a step back and give you what I think is the big-picture perspective on this. The threshold question, and it's always for a court, we absolutely believe this, is whether there is a contract between the two parties. That means has there been offer, has there been acceptance, and that's usually where the debate is. Has there been consideration? After that, you get to step two. Step two is to ask the question about whether or not the agreement includes a delegation clause. If it does not, then it's for the court to resolve any challenge to enforceability. If there is a delegation clause, then the question is, again, construing every part of the agreement in favor of there being an arbitration on the enforceability question, whether or not the terms of the agreement as a whole make it a preordained outcome, a fait accompli, that no arbitrator could plausibly ever rule that the agreement is invalid. I would submit to you that the Ninth Circuit gets this right. There is nothing on the face of a delegation clause like this, which is, I think, functionally the same as what they were looking at there, that would say, no, a plaintiff could never win on that issue. The plaintiffs are sliding. I think you heard it here today. They slide back and forth between talking about delegation clause and talking about the agreement as a whole. That's improper. That's improper under the Supreme Court's precedent in this area, and it's improper because of what the Supreme Court has said, that that is what Congress has dictated in the Federal Arbitration Act for how this analysis is to proceed. And no matter how many policy arguments the plaintiffs want to advance about this industry, about the fairness of any of these agreements, none of that undoes the policy judgment that Congress made, which is that arbitration agreements like this should be affirmed by the courts. The judge will go. I want to take just a moment to address the questions that you presented to my colleague here, which... Can I ask you one question before you ask me that? I want to confirm, because I was looking at the complaints filed by Ms. Dunn, and there isn't any allegation in there that there is no valid contract, from what I can see. That's correct, Your Honor, and the district court found that there was an agreement and the plaintiffs didn't challenge that on appeal. So I would assume that we can safely say that the question of whether there's a contract, that threshold issue for the court, has been definitively resolved. I have just a few seconds left, but Judge Legault, you asked the question about the opt-out clause and whether or not that alters or impacts the unconscionability analysis. I would submit to Your Honor, again, we probably never reached that issue, but as a matter of procedural unconscionability, we believe that that is sufficient to make sure that this agreement is not found procedurally unconscionable. Notice what the plaintiff's assumption here is. Because it's a tribal court, it is necessarily bad. It's necessarily unfair. Unlike the decisions that have found procedural unconscionability where an opt-out leads to a tribal court, they haven't provided any specific argument, evidence, discussion about the tribal court. There's amicus support here that talks about the law of the Tunica Biloxi tribe and their courts. I would think if you look at it, it will comport with every notion you would have of fairness and due process. And the last... What about in the record, from my understanding, is that they want us to take judicial notice of the fact that the tribe's rules of civil procedure were not available to them? So, Judge Legault, the answer to that question is twofold. First, they're wrong when they say that. It's just not true. Any single person could have gone to the clerk's office at the Tunica Biloxi and said, I would like a copy of the Code of Civil Procedure, please, and they could have had it. This is not a secret law. This is not the sort of Gestapo tactics that the plaintiffs, I think, dramatically want to suggest went on here. The second point is, though, yes, they were not available on the Internet when they entered into the agreement, and that has nothing to do with whether they are bound by the tribal law. What was incorporated by reference into this agreement is tribal law as a whole, and that includes the Code of Civil Procedure, whether they could Google it or not. And then the last point is, Judge Legault, you made the point, I think, correctly, that when it comes to choice-of-law clauses, when it comes to upholding them, Florida courts regularly uphold choice-of-law provisions that circumvent or bypass certain Florida statutes. There's nothing unusual about that. There's nothing wrong with that. And I would commend to the court the portion of our brief where we discuss Florida law on this point. We cited no fewer than a dozen cases, all of which say it is perfectly appropriate for a choice-of-law provision to bypass Florida's usury laws. And when the plaintiff asserts that no state in the union would uphold an agreement like that, it's just not true. There are at least five states that have no cap on interest rates. I'm struggling to remember which ones they are, but I believe it's Nevada, Utah, Indiana, Delaware, and I'm probably missing one off the top of my head. But the point is that the idea that this is so sacrosanct, that this is so sacred, that it can never be bypassed, is simply wrong. And I would urge the court to take a look at your 2018 decision in the Veritas case, which rejects many of the arguments the plaintiffs are making now about why, in spite of those decisions, that 40-year body of law from Florida, that these should be ceded as the sort of sacred policy that can never be bypassed. It's just simply not true. Unless there are any other questions from the court, I'm happy to resume my briefs. Thank you very much to both of you. Very interesting case. Thank you very much. Thank you. Have a great day. The court will be in recess until tomorrow morning. Thank you.